[Nos. F008722, F009410. Fifth Dist. Oct. 5, 1989.]

BRONCO WINE COMPANY, Plaintiff, Cross-defendant and Appellant, v.
FRANK A. LOGOLUSO FARMS et al., Defendants, Cross-complainants and Respondents.

[Opinion certified for partial publication.†]

---

†Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.

**COUNSEL**

Furth, Fahrner, Bluemle & Mason, Frederick P. Furth, Thomas R. Fahrner, George F. Bishop and Kathleen Styles Rogers for Plaintiff, Cross-defendant and Appellant.

McCutchen, Doyle, Brown & Enersen, Stephen Grant, John R. Reese, Sherri J. Conrad, Stephen A. Zovickian and Nina Srejovic for Defendants, Cross-complainants and Respondents.

**OPINION**

**BAXTER, Acting P. J.—**

### FACTS AND PROCEEDINGS BELOW

Bronco Wine Company (hereafter Bronco) operates wineries in Fresno and Ceres and processes grapes into wine for sale in bulk to other vintners. The operations of Frank A. Logoluso Farms (hereafter Logoluso) include farming Thompson seedless and French Colombard wine grapes.

In June of 1982, Bronco and Logoluso entered into two ten-year contracts for Bronco's purchase of Logoluso's Thompson seedless and French Colombard grapes. The contracts expressly provide that the grapes' sugar content or "balling" would be calculated separately for each variety by averaging all loads delivered by Logoluso during the season. Sugar content bears on contract provisions dealing with (1) minimum maturity level for acceptance and (2) price. The price provision of the contracts obligates Bronco to pay Logoluso the "highest cash price generally paid by Bronco for such crop year in the area where grown for the same variety of the same balling."

During the spring and early summer of 1982, Bronco contracted to buy Thompson seedless grapes from other growers to meet its 1982 crushing requirements at a guaranteed minimum price of $150 per ton at 20 percent

sugar. Later in the growing season Bronco recognized that there was a surplus of grapes in the industry and that the market price at harvest would approximate $100. The 1982 grape crop was one of the largest in California history. On the other hand, most of Bronco's contracts to sell wine to larger wineries limited Bronco's price to the average price reported by the California Department of Food and Agriculture, the average market price for district 13, or the price at which the largest percentage of grapes was sold.

Faced with its market speculation error, Bronco purchased thousands of additional tons of Thompson seedless grapes at a distressed market price of $100 per ton. It then delayed accepting deliveries of Thompson seedless grapes. While Bronco normally began crushing Thompson seedless grapes by late August, the start of the harvest season, it refused to begin crushing Logoluso's Thompson seedless grapes until September 29. This was despite repeated attempts by Logoluso to obtain a delivery schedule and to get the winery to open sooner. By the time Bronco accepted deliveries of Logoluso's grapes, Logoluso had nearly completed its harvest of grapes delivered to other buyers. Crop-damaging rains started on September 25.

During the latter part of September, Bronco announced and implemented a three-tier program to set the prices it would pay growers for Thompson seedless and French Colombard grapes. The letters to growers explaining the program tied the price per ton exclusively to sugar content and did not authorize Bronco to downgrade deliveries to lower programs based on visual defects. Under the primary program, growers would be paid $150 per ton for Thompson seedless grapes with minimum 20 percent sugar and $175 per ton for French Colombards with minimum 21 percent sugar, less $17.50 (10 percent) for French Colombards at 20 percent sugar. Under the secondary program, Thompson seedless and French Colombard grapes of between 19 and 19.9 percent sugar were priced at $100 and $140 per ton, respectively. Under the substandard program, growers would be paid $4 per sugar point per ton for both varieties between 18 and 18.9 percent sugar content. Grapes below 18 percent sugar were not accepted.

Contrary to the program letters, Bronco arbitrarily and routinely downgraded deliveries to lower programs based on factors such as "visual defects." Bronco violated its own announced policy of allocating exclusively by sugar content.

Grapes allocated to different programs were immediately mixed together and the wine produced was sold as one undifferentiated product of good quality.

Logoluso delivered 4,552 tons of Thompson seedless to Bronco in 1982 and was paid $400,853 or $88 per ton. It delivered 1,169 tons of French

Colombards and was paid $118,425 or $101 per ton. The court concluded that Bronco breached the contracts in underpaying Logoluso for both varieties. The underpayment award for the Thompson seedless grapes was $284,001.23, predicated on a contract price finding of $150 per ton. The underpayment award for the French Colombards was $64,373.80, predicated on a contract price finding of $152.37 per ton.

The court also awarded Logoluso contract interest on the underpayments, $51,800 as compensation for additional harvest expense caused by Bronco's failure to reasonably schedule deliveries, and restitution of $169,139.26 based on Bronco's unfair business practice under Business and Professions Code section 17200. The judgment contained restitution awards totalling $457,005, plus interest, to 27 growers who were not parties to the action.

Bronco filed a timely appeal attacking the judgment. Logoluso filed a timely cross-appeal seeking attorney fees. We will affirm the judgment for Logoluso and reverse the judgment entered on behalf of the nonparty growers. We will also affirm the trial court's denial of Logoluso's claim for attorney fees.

DISCUSSION

I.

*Was the Trial Court Obligated to Calculate Logoluso's Breach of Contract Claims for Underpayments on a "Reasonable Price" Standard Because of Collateral Estoppel?*

Bronco contends the court was obligated to apply a "reasonable price" standard in calculating contract damages caused by Bronco's underpayments on the grapes delivered because of alleged findings made in connection with an administrative proceeding which Bronco maintains is binding through collateral estoppel in this action. We will conclude that the court was not precluded from applying the "highest price" standard contained in the contracts because all of the elements for application of collateral estoppel were not present. The relevant facts are as follows:

A. *Procedural Background.*

1. *The Administrative Proceeding.*

Logoluso and many other growers filed complaints against Bronco with the Department of Food and Agriculture predicated on its alleged viola-

tions of section 55872 of the Food and Agricultural Code.[1] The purpose of the administrative proceeding was to determine whether the department should revoke Bronco's license to produce wine.[2] The complaints proceeded to an administrative hearing that concluded on April 8, 1985, with a statement of decision by Hearing Officer Krade. The hearing officer did not adjudicate the value of the grapes delivered, but noted that the contracts provided for an open price. He concluded "that Bronco violated the provisions of Section 55872 in that *it failed and refused to pay the contract prices or reasonable prices to* [Logoluso] . . . ." (Italics added.)

The hearing officer recommended that Bronco's license to produce wine be suspended until Bronco settled the claims of Logoluso and the other complainants. The department accepted the recommendation and conditionally suspended Bronco's license.

Bronco filed a writ of mandamus in Stanislaus County Superior Court, pursuant to Code of Civil Procedure section 1094.5, to overturn the department's conditional license suspension. Judge Norman Reid rendered a judgment denying the writ as to Logoluso's complaint, concluding that the department's findings and conclusions were fully supported by the evidence. Judge Reid did not adjudicate the amount Bronco owed Logoluso for the grapes delivered but noted in his statement of decision that ". . . the evidence fully supports the finding that a reasonable price was not in fact paid."

Bronco seizes upon the following observation in Judge Reid's statement of decision as the basis for its collateral estoppel contention: "The contract price thus found by the hearing officer is clearly the 'reasonable price' standard notwithstanding the fact that he may have referred to contract prices or reasonable prices in the disjunctive as if the two were somehow not the same."

Judge Reid's statement of decision notes that a reasonable offer from Bronco to settle the administrative proceeding, even if rejected by Logoluso, would justify the department's vacating the conditional license suspension: "As to LOGOLUSO FARMS, it is true that no finding of a contract price was made and settlement must inevitably depend upon negotiations between the

---

[1] Food and Agricultural Code section 55872 provides: "It is a violation of this chapter if the applicant, or licensee, has failed or refused to pay for any farm product at the time and in the manner which is specified in the contract with the producer, or as is otherwise provided in this chapter."

[2] Thirty-seven complaints by thirty-six growers were originally filed against Bronco. The complaint by Allied Grape Growers was severed and 17 other complaints were dismissed before Officer Krade held his hearing.

parties and their good faith efforts in making a reasonable settlement. This, however, does not vest in LOGOLUSO the unfettered discretion to deny petitioner its license by making unreasonable contract demands.

"At oral argument . . . considerable discussion was had concerning whether, pursuant to the provisions of § 55851 of the Agricultural Code, the respondent [department] retained jurisdiction to monitor the course of settlement negotiations and to relieve petitioner [Bronco] from any failure to achieve settlement in the event it had made reasonable efforts to do so which were frustrated by arbitrary and unreasonable conduct of a claimant. In the course of such argument, petitioner expressed substantial doubts that that remedy either existed or, if it did, that it was adequate for constitutional and practical purposes. The court disagrees. In the event reasonable settlement offers are made by petitioner which are frustrated by unreasonable demands of a party claimant, the respondent has inherent power incident to its control over the licensing process to amend its order and relieve petitioner of its suspension if such circumstances appear. Until such time as petitioner can demonstrate that it has made reasonable settlement offers or entered into reasonable settlement negotiations predicated upon the findings and conclusions of respondent, it is not entitled to further judicial relief."

Bronco filed with this court (case No. F007220) an appeal from Judge Reid's judgment and a petition for writ of mandate or prohibition. This court appointed Judge Reid as special referee to determine the present reasonable settlement value of Logoluso's claim (and the claims of two other growers). Judge Reid's report dated August 5, 1986 (issued after Judge Keyes's intended decision was filed in the instant action) contains the following assessment of the standards asserted: "[R]espondent [department] argues that the reasonable price standard yields the same result as the 'highest price generally paid' standard Logoluso argued successfully before Judge Keyes. In my view, there is merit to this contention. While I was precluded in the course of the Mandamus proceeding from making an independent determination of the dollar amount that should have been paid, it was my feeling then that the result was essentially the same regardless of which standard was applied. It is even more so my feeling at this time."

On December 19, 1986, after Judge Keyes filed his intended decision in the instant action, Bronco filed a motion with the department to vacate its conditional license suspension. Hearing Officer Krade conducted a hearing and issued findings on April 7, 1987. He found that Bronco's underpayments to Logoluso for the Thompson seedless and French Colombard grapes were exactly the amounts previously determined by Judge Keyes in the instant action. He expressly found that the contract prices for the

Thompson seedless and French Colombard grapes were $150 and $152.37 per ton, respectively, whether calculated under the "highest price" or "reasonable price" standards. The hearing officer also concluded that Bronco owed Logoluso statutory late charges under Food and Agricultural Code section 55881 in the amount of $253,700.12 as of February 10, 1987. The department adopted the proposed decision of the hearing officer as its decision and denied Bronco's motion to vacate the license suspension.

On June 9, 1987, Bronco paid Logoluso $627,208 "under protest" in full payment of the underpayments and statutory late charges the hearing officer and department found due and owing. The department then vacated Bronco's license suspension.

On June 11, 1987, Bronco voluntarily dismissed its appeal of Judge Reid's judgment in the administrative mandamus proceeding. Bronco asserts the dismissal made the judgment final thereby obligating Judge Keyes to utilize the reasonable price standard mentioned in Judge Reid's statement of decision because of collateral estoppel.

### 2. The Instant Trial.

The contracts contain the following provision concerning prices for the grapes: "PRICES FOR GRAPES. Grapes covered by this contract meeting the contract standards set forth herein and testing not less than the industry accepted Balling *will be paid the highest cash price generally paid by BRONCO* for such crop year in the area where grown for the same variety of the same Balling. Sugars or Balling will be based on the average of the total deliveries by [Logoluso] in a given year." (Italics added.)

The court rejected Bronco's contention that the contracts were "reasonable price" contracts under California Uniform Commercial Code section 2305: "[T]he Court finds this section [§ 2305] does not apply to this case. In these contracts Bronco agreed to pay the highest price generally paid for the same variety of grape of the same balling. This language was negotiated between the parties. If Bronco intended to pay less than the highest price, Bronco would have negotiated a different price, such as an average price. The Court finds the language of the contract is not ambiguous. . . ."

The court's judgment included awards of $284,001.23 for underpayment on the Thompson seedless contract and $64,373.80 for underpayment on the French Colombard contract. These awards were predicated on findings that the contract prices for the Thompson seedless and French Colombards were $150 and $152.37 per ton, respectively, calculated through the court's use of the contracts' "highest price" standard. Bronco contends the court

erred in that it was obligated to use the "reasonable price" standard because of collateral estoppel.

B. *The Collateral Estoppel Test.*

■ The doctrine of collateral estoppel acts as a bar to a party or one in privity from relitigating any issue decided in a prior proceeding. The doctrine applies regardless of whether the issue was brought on the same or on a different cause of action. (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 874 [151 Cal.Rptr. 285, 587 P.2d 1098].)

The burden of proving collateral estoppel rests with the party asserting the doctrine. (*First N.B.S. Corp.* v. *Gabrielsen* (1986) 179 Cal.App.3d 1189, 1194 [225 Cal.Rptr. 254]; *Jackson* v. *City of Sacramento* (1981) 117 Cal.App.3d 596, 602 [172 Cal.Rptr. 826].)

■ There are three essential elements for application of collateral estoppel. First, the issue to be precluded from reconsideration must be identical to the issue previously litigated. Second, the prior action must have resulted in a final judgment on the merits. Third, the parties in the later action against whom the doctrine is asserted must be the same or in privity with the parties in the former action. (*Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.* (1962) 58 Cal.2d 601, 604 [25 Cal.Rptr. 559, 375 P.2d 439]; *Zaragosa* v. *Craven* (1949) 33 Cal.2d 315, 317 [202 P.2d 73, 6 A.L.R.2d 461]; *Evans* v. *Celotex Corp.* (1987) 194 Cal.App.3d 741, 744 [238 Cal.Rptr. 259].)

■ The doctrines of res judicata and collateral estoppel serve two public policies. The first is preventing a party who already has had a fair trial on an issue from again drawing it into controversy. The second is to protect parties from being twice vexed for the same cause. (*Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 811 [122 P.2d 892]; *Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd., supra,* 58 Cal.2d 601, 604.) Preventing relitigation of the same issue also fosters the important public policy of judicial economy.

Although the doctrine of collateral estoppel has historically been applied to actions brought before judicial tribunals, it has been recently applied to administrative proceedings as well. In *People* v. *Sims* (1982) 32 Cal.3d 468 [186 Cal.Rptr. 77, 651 P.2d 321], the California Supreme Court held that an administrative finding that a party did not commit welfare fraud barred a later criminal prosecution for the same alleged fraud. The *Sims* court reasoned in part that the People could not meet the criminal burden of proof beyond a reasonable doubt where there was a failure to prove the same

charges by the lesser preponderance of the evidence standard used in administrative proceedings. (*Id*. at p. 485.) Important in the *Sims* court's reasoning was the fact that the Department of Social Services was acting in a judicial capacity as it conducted the administrative hearing. (*Id*. at pp. 480-481.)

After *Sims,* the Supreme Court held that the decisions of the Workers' Compensation Appeals Board could be given collateral estoppel effect. (*Traub* v. *Board of Retirement* (1983) 34 Cal.3d 793, 798 [195 Cal.Rptr. 681, 670 P.2d 335].) Administrative collateral estoppel has been applied to the administrative adjudications of the State Board of Control. (*Carmel Valley Fire Protection Dist.* v. *State of California* (1987) 190 Cal.App.3d 521, 534-537 [234 Cal.Rptr. 795].)

The *Sims* rule was not set forth in broad, far-reaching terms. Subsequent cases interpreting *Sims* have carefully scrutinized the nature of the remedy involved before applying collateral estoppel. For collateral estoppel to have any effect, the issue decided in the previous proceeding must be *identical*. Where the issue in an unemployment insurance case was misconduct, it was held that the finding of misconduct was not the same as a finding of insubordination. Thus, the findings of a county employment commission could not be given collateral estoppel effect. (*Amador* v. *Unemployment Ins. Appeals Bd.* (1984) 35 Cal.3d 671, 684-685 [200 Cal.Rptr. 298, 677 P.2d 224].)

■ Not only does the issue previously litigated have to be identical, no aspect of what was decided in the previous proceeding can be left to conjecture. Evidence extrinsic to the judgment roll may be used to ascertain which issues were determined in the original action. (*Southwell* v. *Mallery, Stern & Warford* (1987) 194 Cal.App.3d 140, 144 [239 Cal.Rptr. 371].)

The court in *Pawlowski* v. *Pierce* (1988) 202 Cal.App.3d 692 [249 Cal.Rptr. 49] held that there was no issue identity between a criminal proceeding and an administrative proceeding for a driver's license revocation. The *Pawlowski* court reasoned that the issue in the criminal action was the willful failure to submit to a chemical test. Because the Department of Motor Vehicles license revocation hearing was civil, no element of willfulness was necessary to suspend the driver's license. (*Id*. at pp. 698-699.)

In *Mahon* v. *Safeco Title Ins. Co.* (1988) 199 Cal.App.3d 616 [245 Cal.Rptr. 103], the court held that a prior hearing before the Unemployment Insurance Appeals Board did not collaterally estop a future lawsuit for wrongful termination. The *Mahon* court rejected the employer's contention that *Sims* created a flat rule that whenever an administrative hearing is

a judicial, adversarial hearing that collateral estoppel necessarily applies to its findings. (*Id.* at p. 622.)

*Mahon* focused on the difference in remedies afforded employers in the administrative scheme and a lawsuit for wrongful termination. Finding that the scheme of remedies was completely different between the two hearings, *Mahon* reasoned that collateral estoppel could not be applied to the administrative hearing before the Unemployment Insurance Appeals Board: "Resolving the issue also includes consideration of matters such as the effect of a nominal economic stake in issue in the administrative hearing (*Kelly* v. *Trans Globe Travel Bureau, Inc.* (1976) 60 Cal.App.3d 195, 202-203 . . .) and the policy of the administrative scheme concerning subsequent issue preclusion. 'An adjudicative determination of a claim by an administrative tribunal does not preclude relitigation in another tribunal of the same or a related claim based on the same transaction if the scheme of remedies permits assertion of the second claim notwithstanding the adjudication of the first claim.' (Rest.2d Judgments, § 83, subd. (3); also see *id.*, § 26, subd. (d); *id.*, § 83, com. *h*, illus. 12.)

"We find no implication in *People* v. *Sims* that such considerations are no longer pertinent to collateral estoppel doctrine. Both kinds of considerations present material grounds for rejecting such an effect for UIB [Unemployment Insurance Appeals Board] determinations in a wrongful discharge action. The amount of money at stake in a UIB hearing will often be small and with respect to the costs of full blown litigation that could be warranted by the substantially greater stake in a wrongful discharge claim. Accordingly, a party to a UIB proceeding might be unfairly sandbagged if the results of the proceeding are given issue preclusion effect. Second, the administrative scheme for resolution of UIB claims was intended to be speedy and informal. (See *Gibson* v. *Unemployment Ins. Appeals Bd.* (1973) 9 Cal.3d 494, 499 . . . .)" (199 Cal.App.3d at p. 622.)

■ The fundamental nature of the administrative proceedings before the department and the trial for civil damages are significantly different. The primary issue in the administrative hearings is to determine whether to revoke the processor's license. The primary issue in the civil action is to determine the amount necessary to fully compensate the grower for the processor's breach of contract. What may be a reasonable offer to settle the administrative proceeding and to restore the processor's license may be significantly less than full compensation to the grower for the breach of contract.

Bronco was charged with the refusal to pay for farm products in violation of Food and Agricultural Code section 55872 et seq. These sections are

contained within chapter 6 of division 20 of the Food and Agricultural Code. The express legislative declaration of this section is to protect the public, not to replace the judicial system for civil contract violations. Section 55431 states: "The marketing of agricultural commodities within this state is hereby declared to be affected with a public interest. The provisions of this chapter are enacted in the exercise of the police powers of this state for the purpose of protecting the health, peace, safety, and general welfare of the people of this state."

The court in *Almaden-Santa Clara Vineyards* v. *Paul* (1966) 239 Cal.App.2d 860, 871 [49 Cal.Rptr. 256], recognized that even after disciplinary actions are taken in an administrative proceeding by the department, the parties still have independent civil remedies available. Though this case reviewed an earlier legislative scheme under the old Agricultural Code, that system operated in similar fashion to the current administrative system.

Furthermore, the remedies provided for in chapter 6 are not identical to civil remedies a producer of agricultural products may be entitled to receive outside the Food and Agricultural Code. It is a violation of section 55878 for a processor of agricultural products to fail to make timely payment for products received. Although the department can assess late fees for delinquent payments on contracts under section 55881, the department has no power to assess civil damages or to enforce its own orders outside the revocation of the offending producer's license.

The department can levy a civil penalty of $500 for each violation payable to the state treasury. (Food & Agr. Code, § 55922.) The department can also impose criminal penalties and sanctions. (Food & Agr. Code, §§ 55901-55906.) But outside its power to revoke a processor's license, the department has no independent authority or power to force compliance with an order or a conditional order. (See Food & Agr. Code, § 55841 et seq.) Though the department cannot impose a civil remedy, it can try to coerce a processor to negotiate a settlement to a producer's claim. (Food & Agr. Code, §§ 55847 & 55851.)

The department's power is broad, but its ability to remedy breaches of contract is still limited. Its remedial powers are not identical to a civil court's remedial powers. The general rule is that the issue previously litigated must be *identical* to the issue before the second tribunal. As the *Mahon* case holds, issue identity must also include identity of remedy. Neither the legislative mandate behind license revocations, nor the express remedial powers bestowed upon the department, are directed toward making a producer whole for a breach of contract by a processor.

The department's lack of authority to fully remedy breaches of contract or potential business torts is recognized in Food and Agricultural Code section 55437, which provides: "The rights, remedies, and penalties which are provided for in this chapter are in addition to any other rights, remedies, or penalties which are provided for by law, and any acts or parts of acts in conflict therewith are hereby repealed."

This section illustrates the department's authority is not exclusive, but that it is in addition to any other remedies that may be available to a party. The Food and Agricultural Code is not a self-contained system with exclusive remedies. Thus, it is completely unlike the workers compensation system which creates the exclusive remedies available to injured workers unless the worker's injury falls within one of that code's enumerated exceptions. (Lab. Code, § 3600 et seq.; *Soil Engineering Construction, Inc. v. Superior Court* (1982) 136 Cal.App.3d 329, 331-333 [186 Cal Rptr. 209].)

A review of the administrative proceedings reveals that Hearing Officer Krade, Judge Reid and the department expressly refrained from adjudicating the contract prices until after Judge Keyes did so in the instant action. Thereafter, in ruling on Bronco's motion to vacate the license suspension, the hearing officer concluded that the contract prices were the same as previously found by Judge Keyes. The issue of contract prices was not previously determined in the administrative proceedings. Therefore, the doctrine of collateral estoppel has no application to that basic issue. (See 7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, § 266, p. 707, and authorities cited therein.)

Our review also reveals that the hearing officer, judge, and department agreed throughout that Bronco underpaid Logoluso for the grapes under all standards advanced. Moreover, they concluded that the same price would result under the reasonable price or highest price standards. Therefore, even if one assumes that Judge Reid's observation in the statement of decision was a finding, it was entirely unnecessary to the judgment rendered and should not be given collateral estoppel effect. (See 7 Witkin, Cal. Procedure, *supra,* Judgment, § 268, p. 710, and authorities cited therein.)

For the various reasons set forth above, we conclude that the identical issue element does not exist for application of collateral estoppel. Therefore, the court was not precluded by that doctrine from applying the "highest price" standard contained in the contracts.

II., III.*

. . . . . . . . . . . . . . . . . . . . .

IV.

*Did Bronco's Payment of Statutory Late Fees Awarded in the
Administrative Proceeding Constitute Satisfaction of Contract Interest
Awarded in the Instant Action?*

On June 9, 1987, Bronco paid Logoluso $627,208.02 "under protest" in
full payment of the Thompson seedless and French Colombard underpay-
ments (as determined by the department and the trial court in this action)
and statutory late charges (as determined by the department). The depart-
ment then vacated Bronco's license suspension.

■ The court in this action awarded Logoluso contract interest of
$219,590.88 on the underpayments. The court rejected Bronco's motion for
an order that its payment of statutory late charges of $253,700.12 in the
administrative proceeding fully satisfied the lesser contract interest award in
this action. Bronco's appeal from this order (case No. F009410) was consol-
idated with the main appeal in this action (case No. F008722). Bronco's
basic contention is that Logoluso is not entitled to contract interest awarded
in the instant action *and* statutory late fees awarded in the administrative
action because this would constitute double recovery.

The department is authorized to award statutory late fees pursuant to
Food and Agricultural Code section 55881. That section provides: "Under
a contract for the purchase or handling of any farm product, any delinquent
payment of money under this chapter shall also include a late charge of 5
percent per month of the unpaid balance calculated on a daily basis for the
period of the delinquency for the first month and an additional 1 percent
per month of the unpaid balance calculated on a daily basis for the remain-
ing period of the delinquency. Any such late charge shall be payable to the
person from whom the farm product was purchased, unless the person
waives, in writing, his right to such payment. Such waiver shall be valid and
effective only when given after a delinquency has occurred.

"This section does not affect the time of payment provided for in this
chapter or in any contract for the purchase or handling of any farm prod-
uct."

---

* See footnote, *ante,* page 699.

Bronco sets forth five arguments in support of its position: First, the department interprets Food and Agricultural Code section 55881 in administrative proceedings to mean that an aggrieved producer can receive statutory late fees or contract interest but not both. Second, it defies common sense to award both statutory late fees and contract interest. Third, where a contract provides for a specific interest rate (the contract here sets forth an interest rate at the current rate plus 3 percent), decisional law holds that the contract rate governs and that the plaintiff should not also receive statutory prejudgment interest. Fourth, the contract rate is very high. Adding 3 percent to the "current rate" in addition to statutory fees, the total comes to 30 percent per annum. Bronco contends that this rate is not only exorbitant, but that it is tantamount to an award of punitive damages not allowed for breach of contract actions. Fifth, the trial court's order is inconsistent because it effectively holds that Logoluso may receive both interest and late fees even though it earlier held that Logoluso could only have one or the other but not both.

Bronco's basic contention is that it would be unfair to have to pay contract interest and statutory late charges. However, Bronco cites no case, statute or general legal principle that prevents the award and payment of both.

The apparent policy underlying chapter 6 of division 20 of the Food and Agricultural Code undermines Bronco's position. Section 55437 specifically makes cumulative all rights, remedies and penalties provided for in chapter 6 of division 20. It provides: "The rights, remedies, and penalties which are provided for in this chapter are in addition to any other rights, remedies, or penalties which are provided for by law, and any acts or parts of acts in conflict therewith are hereby repealed."

This section permits the award of statutory late fees *in addition to* any other remedies Logoluso may be entitled to receive. As discussed in part I, *ante,* the policies and purposes underlying the department's action under the Food and Agricultural Code are separate and apart from a private cause of action for breach of contract. (See *Almaden-Santa Clara Vineyards* v. *Paul, supra,* 239 Cal.App.2d 860, 871.)

Though Logoluso could not twice recover the award of contract damages for the principal amount of the grapes, statutory late fees are a form of penalty for the nonpayment of an obligation, whereas interest is a form of compensation used to restore plaintiff for moneys that have been unavailable for a business or investment. Statutory late fees and interest are not two forms of the same remedy but are two separate classes of remedies.

This court has interpreted the cumulative remedy provision of Food and Agricultural Code section 55437 as not requiring an exhaustion of depart-

ment administrative remedies before an action can be maintained in superior court. (*McKee* v. *Bell-Carter Olive Co.* (1986) 186 Cal.App.3d 1230, 1240-1246 [231 Cal.Rptr. 304].)

The department and the courts effectively have concurrent jurisdiction over the subject matter of this case. (See 3 Witkin, Cal. Procedure, *supra,* Actions, § 243, p. 274.) There is no legal reason why the department or the trial court could not impose both interest and statutory late fees.

The trial court properly denied Bronco's motion to declare the contract interest portion of the judgment satisfied by payment of the statutory late fees awarded in the administrative proceeding.

V.

*Did the Trial Court Err in Awarding Restitution Damages to Nonparty Growers?*

■ The 10th cause of action of Logoluso's cross-complaint sought restitution damages on behalf of Logoluso and "all growers under contract to Bronco in 1982" predicated on "unlawful, unfair or fraudulent business practice" in violation of Business and Professions Code section 17203. It provides: "Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."[3]

The types of conduct complained of on behalf of the over 100 nonparty Bronco growers included wrongfully rejecting and refusing to accept grapes, adopting arbitrary quality standards, applying quality standards unreasonably in order to pay less for accepted grapes than the price agreed to by Bronco, and threatening to sue and suing growers who complained of Bronco's conduct.

Bronco's general demurrer to this cause of action was overruled. Bronco's pretrial motions to strike Logoluso's claims on behalf of nonparty growers or, alternatively, to require that the class action procedure[4] be

---

[3] The term unfair competition includes unlawful, unfair or fraudulent business practice. (Bus. & Prof. Code, § 17200.)

[4] Class actions are permitted under Code of Civil Procedure section 382. It provides: "If the consent of any one who should have been joined as plaintiff cannot be obtained, he may

utilized, was opposed by Logoluso and denied by the trial judge pursuant to *Fletcher* v. *Security Pacific National Bank* (1979) 23 Cal.3d 442 [153 Cal.Rptr. 28, 591 P.2d 51]. No effort was made by the court or the parties to encourage the nonparty growers to join as party plaintiffs in this action.[5]

The only nonparty Bronco grower who appeared as a witness at trial testified he had no objection to the amount received from Bronco for his 1982 grape crop.[6]

Once it became apparent that the court was going to award restitution damages in favor of nonparty growers, Bronco sought to secure their releases. Many were secured, some for compensation and others without. Declarations supporting and attacking the validity of releases were filed. For example, Logoluso filed declarations of two nonparty growers stating Bronco's field man secured releases without advising them that the court was going to award nonparty growers restitution damages. The field man denied this accusation. The trial judge issued a temporary restraining order to prevent Bronco from obtaining releases from nonparty growers without first informing them of the restitution they received from the judgment. Bronco contends it has valid releases executed by 12 of the growers who received restitution damages.[7] One such grower, Donny Bros., expressly disavowed any right to restitution. The trial judge did not grant restitution awards in favor of 16 growers who executed releases.

Contracts of 20 nonparty growers were introduced into evidence. They provided for prices of $175 per ton and $150 per ton for French Colombards and Thompson seedless, respectively, at 20 percent sugar. Other exhibits contained the Brix levels and tonnages of grapes produced and delivered by nonparty growers awarded restitution.

---

be made a defendant, the reason thereof being stated in the complaint; and when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

[5] Code of Civil Procedure section 378 provides: "(a) All persons may join in one action as plaintiff if:

"(1) They assert any right to relief jointly, severally, or in the alternative, in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action; or

"(2) They have a claim, right, or interest adverse to the defendant in the property or controversy which is the subject of the action.

"(b) It is not necessary that each plaintiff be interested as to every cause of action or as to all relief prayed for. Judgment may be given for one or more of the plaintiffs according to their respective right to relief."

[6] Charles Mosesian appeared as a witness for Bronco.

[7] The 12 growers are Brar & Sons, Donny Bros., Elmco, Elmer Merk, Tenneco West, Ramona Chavira, J. Carrera, Cattani & Sons, Enas Farms, Patrick Sagouspe, Tom Karle, and R & S Farms.

The trial court awarded restitution damages totalling $457,005 plus interest to 27 nonparty growers. The court's statement of decision provides: "The Court finds with regard to this cause of action that the program letters made no mention of downgrading. The letters placed grapes in different programs based on sugar, or rejected the grapes based on defects. Once the grapes were accepted, sugar level was the stated basis for program placement. As the evidence revealed, the program letters were a sham and an undisclosed vehicle for downgrading grapes in order to pay much lower prices to the sellers. The Court finds this practice is an unfair and fraudulent business practice and constitutes and [*sic*] unfair business practice under Section 17200 of the Business and Professions Code.

"⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱

"Pursuant to Section 17203 of the Business and Professions Code, the Court orders that Bronco restore to its sellers for the crop year 1982, who the Court finds are persons in interest, the money withheld by Bronco as a result of this unfair business practice."

The procedure utilized with regard to the nonparty growers raises serious fundamental due process considerations. ■ Rendering a judgment for or against a nonparty to a lawsuit may constitute denial of due process under the United States and California Constitutions. (*Lambert* v. *California* (1957) 355 U.S. 225, 228 [2 L.Ed.2d 228, 231, 78 S.Ct. 240]; *Twining* v. *New Jersey* (1908) 211 U.S. 78, 110-111 [53 L.Ed. 97, 110-111, 29 S.Ct. 14].) Due process is denied because the nonjoined party has not been given notice of the proceedings or an opportunity to be heard. (*Ibid.*) Notice and a chance to be heard are essential components to the trial court's jurisdiction and for due process. Without jurisdiction over the parties, an in personam judgment is invalid. (*Environmental Coalition of Orange County, Inc.* v. *Local Agency Formation Com.* (1980) 110 Cal.App.3d 164, 173 [167 Cal.Rptr. 735].)

For over 50 years California has recognized that a judgment may not be entered either for or against one who is not a party to an action or proceeding. (*Hutnick* v. *United States Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 469 [253 Cal.Rptr. 236, 763 P.2d 1326]; *International Aerial Tramway Corp.* v. *Konrad, Doppelmayr & Sohn* (1969) 70 Cal.2d 400, 407 [74 Cal.Rptr. 908, 450 P.2d 284]; *Fazzi* v. *Peters* (1968) 68 Cal.2d 590, 594 [68 Cal.Rptr. 170, 440 P.2d 242]; *In re Wren* (1957) 48 Cal.2d 159, 163 [308 P.2d 329]; *McKeon* v. *Hastings College* (1986) 185 Cal.App.3d 877, 899 [230 Cal.Rptr. 176]; *Promotus Enterprises, Inc.* v. *Jiminez* (1971) 21 Cal.App.3d 560, 566-567 [98 Cal.Rptr. 571]; *Community Redevelopment Agency* v. *Superior Court* (1967) 248 Cal.App.2d 164, 176 [56 Cal.Rptr.

201]; *Wong* v. *Superior Court* (1966) 246 Cal.App.2d 541, 546 [54 Cal.Rptr. 782]; *Estate of Majtan* (1965) 237 Cal.App.2d 7, 21 [46 Cal.Rptr. 561]; *Hutchinson* v. *California Trust Co.* (1941) 43 Cal.App.2d 571, 575-576 [111 P.2d 401]; *Samter* v. *Klopstock Realty Co.* (1939) 31 Cal.App.2d 532, 535 [88 P.2d 250]; *Overell* v. *Overell* (1937) 18 Cal.App.2d 499, 502 [64 P.2d 483]; 7 Witkin, Cal. Procedure, *supra,* Judgment, § 25, pp. 469-470.) The *Fazzi* case recognizes that this doctrine has common law antecedents. (68 Cal.3d at p. 594.)

In rare instances, appellate courts have found that trial courts had jurisdiction to render judgments over nonparties to lawsuits. An example is *Severdia* v. *Alaimo* (1974) 41 Cal.App.3d 881, 887-890 [116 Cal.Rptr. 405]. In *Severdia,* an attorney who represented a wife in a dissolution action was not a named party to the action. The court found, however, that counsel conferred jurisdiction on the trial court by asserting a lien on community assets and generally appearing in an order to show cause. Because the attorney's appearance on the order to show cause constituted a general appearance, the attorney conferred to the trial court general jurisdiction over his person. The attorney's later objection to the trial court's jurisdiction on the ground that he was not a named party in the lawsuit was rejected. Counsel himself had sought to enter the litigation, and the *Severdia* court found that he had done so. (*Ibid.*)

The *Severdia* case is obviously distinguishable from the instant action. Here, none of the nonparty growers sought to enter this lawsuit. There is no evidence that the nonparty growers were ever given notice of these proceedings or an opportunity to be represented by counsel of their own choosing.

Of the 27 nonparty growers who received restitution damages, the contracts of only 20 of these growers were presented into evidence. Other exhibits showed that all recipients of restitution damages did have written contracts with Bronco. Bronco now contends that it has valid releases executed by 12 of the growers who received restitution damages. Of the 12 growers who purportedly executed releases, the record before us reveals that only Donny Bros. has expressly disavowed any right to restitution.

At a posttrial hearing, several of the nonparty growers who had purportedly signed releases challenged their validity because they had not been notified by Bronco, Logoluso, the court, or by anyone else that a judgment for restitution damages had been entered on their behalf. This is precisely why due process demands that parties be given notice and an opportunity to be heard before judgment is entered for or against them. The nonparty growers had no opportunity to present their claims before the trial court by

counsel of their own choice. Others, like Donny Bros., might elect to waive any such opportunity, preferring not to jeopardize an ongoing beneficial business relationship. Bronco's task of defending numerous claims brought on behalf of many nonparty growers became much more complex and difficult than if limited only to Logoluso's. We need not decide whether it reached a procedural due process violation.

The trial court's denial of Bronco's pretrial motion to strike the restitution claims of the nonparty growers or, alternatively, to have the nonparty growers added to the lawsuit by way of class action was predicated on the Supreme Court's decision in *Fletcher* v. *Security Pacific National Bank, supra,* 23 Cal.3d 442. *Fletcher* was a *class action* against Security Pacific for overcharging interest by calculating it on a 360-day year rather than a 365-day year. The amount of overcharge was small even for large loans. (*Id.* at pp. 445-447.)

The *Fletcher* court held that proof of each individual borrower's lack of knowledge of the bank's practice was not necessary to recover damages for the entire class of borrowers affected by the unfair trade practice pursuant to Business and Professions Code section 17535. (23 Cal.3d at pp. 453-454.) Although individualized proof of knowledge was not necessary to prove an unfair trade practice against each member of the class, the action in *Fletcher* was nevertheless a *class action*. As such, each participating member of the class was a party to the lawsuit and subject to the court's jurisdiction.

The trial court's reliance on *Fletcher* was misplaced. While it represents that an individual representative action can be maintained, that dicta is qualified by the following statement: "Although an individual action may eliminate the potentially significant expense of pretrial certification and notice, and thus may frequently be a preferable procedure to a class action, the trial court may conclude that the adequacy of representation of all allegedly injured borrowers would best be assured if the case proceeded as a class action. Before exercising its discretion, the trial court must carefully weigh both the advantages and disadvantages of an individual action against the burdens and benefits of a class proceeding for the underlying suit." (23 Cal.3d at p. 454.)

The recent case of *Dean Witter Reynolds, Inc.* v. *Superior Court* (1989) 211 Cal.App.3d 758 held that the trial court abused its discretion by permitting the unfair competition action to proceed by class action where there was no showing that class treatment was demonstrably superior to an individual, representative action. (*Id.* at p. 772.) The *Dean Witter Reynolds* court, relying on *Fletcher,* then found that a court in an unfair competition lawsuit "is empowered to grant equitable relief, including restitution in

favor of absent parties, without certifying a class action." (*Id*. at p. 773.) The court recognized, however, that parties absent from a lawsuit are not generally "bound by a judgment unless they were in privity with a party and the adjudication of their rights comports with due process." (*Ibid*.)

We note that the above quoted language in *Fletcher* is dictum since *Fletcher* was maintained as a class action. We further note that to the extent *Dean Witter Reynolds* recognizes an individual, representative action outside the confines of class action procedure in the context of unfair competition cases, that it further recognizes that such judgments are not binding as to nonparties. One must question the utility of a procedure that results in a judgment that is not binding on the nonparty and has serious and fundamental due process deficiencies for parties and nonparties.

Without reaching the issue of whether it is proper to maintain an individual, representative action for unfair competition outside the confines of a class action, we find that *Dean Witter Reynolds* is factually distinguishable from the instant action. The business practice at issue there was whether the brokerage house could charge a $50 termination fee for withdrawing an IRA account. The charge is either a fair or unfair business practice. The only issue in controversy is the legality of the termination fee. The amount of restitution for each person is identical, return of the $50 termination fee.

Furthermore, the amount of restitution per person in actions like *Fletcher* and *Dean Witter Reynolds* is nominal. The need for strict adherence to the principles of procedural due process to protect the interests of nonparties, though not unimportant, is less compelling.

The determination of whether the business practice was unfair was a far more complex factual issue in the instant case than in either *Fletcher* or *Dean Witter Reynolds*. Also, the potential amount of restitution in the instant case is far greater than in *Fletcher* or *Dean Witter Reynolds*. The process of determining the amount of restitution to award is not the automatic calculation that it was in *Dean Witter Reynolds*. Whatever propriety there may be in allowing an individual, representative action in *Dean Witter Reynolds* does not exist in the instant action. The trial court's denial of Bronco's pretrial motion led to the insurmountable control and management problems associated with awarding judgments for or against nonparties not subject to the court's jurisdiction.

Each nonparty grower was encouraged to file a complaint for underpayment against Bronco through the Department of Agriculture under section 55872 of the Food and Agricultural Code, but failed to do so. Thirty-seven such complaints were filed by other Bronco growers. This administrative

process provides growers with an inexpensive and effective remedy. With such a remedy available, one must question whether the unusual remedy under section 17203 of the Business and Professions Code is necessary.

We conclude that the court abused its discretion in denying Bronco's pretrial motion and committed reversible error by awarding restitution damages to the nonparty growers in the manner employed.

Logoluso's claim for attorney fees is predicated on the benefit conferred on the nonparty growers. In view of our conclusion that the judgment favoring nonparty growers must be reversed, we affirm the trial court's decision denying the claim.

The restitution damages awarded Logoluso are not challenged. We note, however, that they are necessarily encompassed in the breach of contract awards based on underpayments for the French Colombard and Thompson seedless grapes.

### DISPOSITION

The judgment in favor of Logoluso is affirmed. Jurisdiction is reserved to the superior court to resolve potential controversies relating to the extent to which the judgment has been satisfied through prior payments from Bronco to Logoluso made in connection with the Department of Agriculture administrative hearings. As explained in part IV, amounts paid as statutory late fees under Food and Agricultural Code section 55881 shall not be credited against this judgment.

The judgment in favor of the nonparty growers is reversed.

The parties shall bear their own costs on appeal.

Dibiaso, J., and Brown (G. A.), J.,* concurred.

A petition for a rehearing was denied November 2, 1989, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied January 18, 1990. Mosk, J., was of the opinion that the petition should be granted.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.